14-0095 into the marriage of, uh, Hamby's? I can't pronounce it. Humble. Humble, you say? Humble's. Humble? Humble's, that's it. Counselor Randy, I see you. Good to please the court. Counselor. Mr. Thompson, this is actually a very simple case that involves a very simple question. In the course of a marriage, especially a long marriage, any marriage, does the husband occupy a superior position to the wife? Is the wife subservient to the husband? That's the question before this court philosophically. In the course of the trial, my client testified and made a very profound statement, and I think it's a very powerful statement, when she said, I have no background besides just a homemaker. She had devoted her entire marriage life, 32 years, to her husband, the two children that she raised, the home. She sacrificed employment opportunities to be a homemaker. She did not pursue education. And what resulted, the marriage that they achieved through that partnership, for lack of a better word, a great deal of material success, to the point at which the husband is grossing, through his efforts in technology and education, over $127,000 a year. But at the same time, his wife is grossing, as a practical matter, nothing. So, at the end of 32 years of marriage, in essence, is she an employee, or is she an equal partner? Did they bring their success together? And when you start the trial judge, came to the conclusion, recognized, acknowledged, the length of the marriage, the lack of marketable skills, and went through all those factors that are laid out in the statute. The problem was, when we got to the amount of maintenance, wasn't the question, should it be permanent? Absolutely, it should have been permanent, but it wasn't announced. The testimony was $3,500, and when you start calculating that against what the testimony was in the financial statements, of after all of this expenses, what the respondent had in debt to use for maintenance, was over $7,000, $7,139 in change, I believe. Mr. Honig, I don't understand how they arrived at the husband's income. If you have $127,199.99, which was his gross for 2013, and you just divide that by 12, you get $9,500 and some change. The court put it at half that, $4,500. Well, Judge, I thank you for asking that question, because I don't either. Because at the trial, his testimony, the financial statements, that was the evidence. That was the evidence. And she got no health insurance? There was no health insurance awarded to my client. Now I'm going to make reference to that on some other points, but that's true. He was covered under his health insurance through the minor corporation. But none, even though the respondent said he had no objection to providing health insurance, he understood the realities of life. And quite frankly, I was stunned when I read the judgment. And we have an individual who's not a senior citizen, and she should be closing in on that direction with no comparable skills. Well, I might as well get away with a little license with all respect to the court. But the fact is, I thought it reasonable to anticipate that would have been addressed by the trial judge in this day and age. But again, as we went through the net and how she came up with $2,500, I have to stand up here and tell the court, I don't know how. And there are no doubt, tragically, that we have guidelines for child support to help aid and assist the trial, in fact, or any court, but there's nothing for maintenance. And there's nothing in the judgment that says other than the key words quoted from the statute and then the quantum leap to this is what I'm awarding. We don't know how the trial judge got from point A to point B. Now, granted, she's not required to make findings of fact. No, I understand that. But we're talking about the year 2014. And not only the rights of a spouse, but the future quality of life of a spouse in a long marriage where the judge, I think, is obligated to at least give us some idea, kind of like a pure white drip tape. How do you want to get from point A to point B? Didn't do it. And when you start crunching numbers and calculating what you end up with, she gets $2,500, and he comes away from his net pay for over $4,600. Now, if she had some extraordinary income or something of that nature, all right, I could understand that. I could grasp that philosophically. But that's not the case. She had no income. Yes, from time to time she's worked at a part-time job as an assistant this and an assistant that, making kind of minimum wage a few hours a week with no benefits. My Lord, if that's going to be the determining factor, that's scary to someone at that age moving on to life after 32 years. Now, and what factored in there but also concerned us, the time of trial, I have no idea how the judge addressed this. The respondent says, well, I want this big house. I want all this property. I want all the responsibilities that go with it. Dollar-wise, we all know that. It really costs a lot more than we think it will. And as a result, I can't afford to pay more. Nonsense. He's chosen. He wants all this. To kind of remind you of the story of the teenager who murders the parents and then throws themselves on the mercy of the court because they're an orphan. It makes no sense at all. And, again, we have nothing from the judge addressing these things. Can we back up to that $127,000? Is that a net or a gross? That was a gross figure. A gross, okay. But even that, as I've mentioned out of sequence, the judge from that, she had to pay part of her own legal fees. So when you talk about what's nice and gross, but when we translate it into real life, that's not a usable amount assuming that she wants to go out and buy a house as opposed to living in something more modest than she'd been living in and assuming that she could even get a loan under her circumstances. And we argued that point in real life. Words are collateral. Or if she gives up the entire amount from the house, where's her safety net? The kind of jobs that she gets held periodically, there's no stability in that. There's no continuity there. And if with $2,500 and she needs $3,500, she's quickly going to use up those extra monies from Scott Credit Union and all of that. It's not there. And that troubles us. And then in addition to no health insurance, which alone would scare the socks off me, you have relocation expenses. You have, if she's going to pursue educational expenses, if she needs new furniture, her legal fees. I call those one-time expenses in the transition period. Well, how does she make up for that? She doesn't have the kind of job if she could even get a job where she could look forward to extra raises because she's been there a long time. How does a person with limited marketing skills make up thousands of dollars of loss? And every time she wants to do anything to improve her situation, to return to the status that she had from that long marriage, how does she do it? The money is not there. And I think she's entitled to have that safety net, that security. This was not we'll get married on Friday and get divorced on Monday and let's have a hoorah in between. She devoted 32 years of her life to this and is now being treated like an employee. Well, this is all you need. Nonsense. This is her life. She's entitled to, as a partner, not just as someone saying, well, get by on this and I'm going my own way. Something is fundamentally wrong with her. And I think the failure to identify those one-time costs factors in, and I think the trial judge, with all due respect, failed to grasp that. Why was the support lowered to $900 a month when she lived in the house? I have no idea. I feel foolish having practiced law a long time, and then I'm trying to repel a court. I have no idea. I have absolutely no idea. And then, to further compound that, if the judgment board says, okay, I'm instructed to prepare the quadro and all those post-trial matters, well, that carries legal fees. I mean, I feel I've contributed my pro bono services over the years, and I'm entitled to that. He's got $127,000 gross, and my client is someone who's lucky to get a minimum wage job when she can get it. And I'm being directed to incur those costs for my client. I have to respond, Your Honor, to the same way as to all these things. I don't know. It is not in the judgment shared with us any guidance on any of this. And so it was this one-size-fits-all. As long as I'm in the judgment, I use the words and I quote from the statute and then say, based on that wording, what I'm doing is right. I don't think that's enough in this day and age, and I don't think treating a wife after a 32-year marriage and all factors considered, well, here, this is all you need. You don't need it anymore. I did all the hard work. I don't think that's relevant anymore. And even as an old fogey myself, I say that. It doesn't make sense. And because there are no guidelines for a trial judge to use, we don't know. And so we come into this court saying we think the judge abused her authority, abused her discretion, I'm sorry, and if we had some idea of what her thinking was, point B, perhaps that would help us, it would help the court, but we don't have that. So what we're asking of this court is to send it back with directions to address those issues. And I think that sums it up very well as far as my client's position. So I thank the court. Thank you, Johnson. Would the clerk shut the door, please? Clerk, shut the door, please. May I please report, counsel? I represent the affilee, Marianne Humbles, who I may refer to as Mr. Humbles or Chip. It's his nickname, and I apologize if I do that. I believe Mr. Hutnick is right. This is a very simple case. Although he said that Mrs. Humbles was just a homemaker, I think that's why the trial court gave her permanent maintenance in this case. It was 32 years of marriage. It's a long time. We didn't dispute that she was the primary homemaker in this marriage for a big part of the marriage. She did work. But it was very far between that she had jobs. As far as the court or the question by justice that the court said he had $4,500, I think that was actually his testimony that after he paid the house mortgage and the taxes and the insurance on the house that he only had $4,500 left. But at some point that house was going to be sold. So it doesn't seem to me that the court took into account his month is increasing monthly income once the house would be sold. He actually refinanced the house. That was his choice, though. It was his choice, and he paid Mrs. Humbles 55% of the equity at the time he refinanced. So he took out an additional debt on top of the $84,000 that was owed on the house. He took an additional debt of $130,000 to pay Mrs. Humbles for that equity in the home. Was the house ordered to be sold? It was not, Your Honor. If he was eligible to refinance, the court ordered that he could refinance. He just had to give her 55% of the equity of the home. And no consideration for what his increased net would have been had he sold the house. Right. And I don't know that he would have had an increase because he had to take out an additional $138,000 on top of the $84,000. Well, if it had been sold, he wouldn't have had that. Correct. There was some confusion in the record as to whether the court actually used the $4,500 or a sum of $6,307 for his net. Which was used? The $6,307, Your Honor. He actually originally had filed a financial statement stating what Mr. Hutnick had argued, that his net was about $7,300. The problem was at that time he was taking four exemptions on his tax return. And after these parties were divorced, he was going to owe an astronomical amount of taxes the following year, which he actually did. In 2014 he owed, and had he kept taking four exemptions and only having himself to actually take as an exemption, he would have probably owed upwards of $12,000 on his tax return. So he amended his paycheck to take out only, I believe it was one exemption at that time, which brought his net down to $6,307, which was more appropriate. So he did actually bring in $6,307 per month. Net? Yes, Your Honor. And then did he not make the last two payments on the house while the divorce was pending? He made all but two payments on the house while the divorce was pending. So he didn't make two of the payments, right? He did not make the first two payments after he moved out. And after that, for about the next year, he made all of the payments. And your question about the $900, while Mrs. Hummels was living in the house, he was paying the mortgage, the insurance, and the taxes on the home. So she was living basically rent-free in the home while he made those payments. And that's why the court said he only had to pay her $900 for maintenance. And then once she moved from the marital home and had to pay a mortgage or rent or whatever she chose to do, he had to bump it up to the $2,500. But she paid the utilities in the house. Correct. Now, he testified that he would give her health insurance. Why didn't the court allow that? Actually, his testimony was that depending on what the outcome is, he wanted to provide her with health insurance. And I don't think that was something that Mr. Hummels wanted to negate from Mrs. Hummels. However, she had testified in one of the court settings that she had a job as an office coordinator making $27,000 a year. And it was four times before at the court, Your Honor. So this was at one point during the testimony. She was making $27,000 a year, and in 90 days she would be eligible for health care benefits from that job. But by the last hearing, that didn't happen. Right. She had quit that job. Yeah. And the court was aware of that. Right. And I think that they took into account that she needed health care insurance with the $2,500 that they gave her. Well, it seems to me the way the court split this up, that once she buys something, if she buys something, assuming she buys something, then she's going to immediately have to eat into her support to do anything. She's going to have to buy health insurance. I mean, even to afford to pay for a small place, it doesn't look like the court's given her enough to afford it. Your Honor, in the asset division, the court actually awarded her 77% of the marital assets. But when you look at the numbers, when you actually look at the numbers and split them up and look what he got versus she got, my calculation shows the husband got $8,000 to the better. Actually, Your Honor, I split the marital assets up and the marital residence was worth $325,000. That was stipulated by the parties. But they didn't use that number because they took off the debt. The debt, which went to Mr. Humboldt, and that was $84,000. She received 55% of that equity, which was $132,000, maybe a little bit more because they actually didn't refinance the house until 2014. That was an amount. She received $178,000. I actually have $189,962. Okay. And if you minus the $6,092, she was required to pay Mr. Hutnick. And you may not be including the marital property of the residence. There was about $9,930 at the marital residence. Ms. Humboldt received about 90% of that marital property. So she received about $90,000 there. You're talking about the dishes and the glassware and all that. All the furniture. But that's not cash. No, no. In actual cash, untaxed cash, she received over $132,000 from the equity in the house. She received 55% of the IRAs, which was about $22,118. She received 55% of 401K, which was about $14,920. She also received an aviator and Bible, which is not cash, but it is marital assets, which totaled about $11,000. When was that last time? Did you hear the last time? At Pontiac Bonneville at the party zone. But then you had to pay Mr. Hutnick. The minus for $6,092 is about $183,870. That doesn't include the non-marital antique glass collection of $30,000 or the $2,500 of maintenance. I understand. I'm just talking cash. Right. Cash she did receive tax-free was over $132,000 from the house. Mr. Humbles received his equity in the house, which was about – well, his total was about $146,171. But then he had to pay $6,000 to Mr. Hutnick, which brought him down to $140,171. And then he also had to take over the mortgage of the house, which was $84,265. So the total value of the marital assets less the debts. Ms. Humbles actually received 77%, and Mr. Humbles received 23%. I do believe that the court followed the case law, followed the factors of 5-504 in awarding this property. Now, Mr. Hutnick, he cited some cases for maintenance. I believe it was Henry the Marriage of Gomer, which is a 5th District case, where Judge Harrison in Madison County awarded no maintenance to the wife whatsoever. But he did award her 84% of the marital property. And I think in that case, the parties were a lot older. It was a 38-year-old marriage. But he felt that if I awarded her maintenance and something happened to the husband, then she might not get it. In the case of Barr, the court also ordered Mr. Humbles to open up a life insurance policy in case he died, and named Mrs. Humbles as the beneficiary of that policy for $150,000. I don't understand the purpose of that. How much does that cost? Is that a term policy? I'm sure it is, Your Honor, but I haven't followed up with that, so I don't know what he's paying per month. So instead of life insurance, sometime in the future, if and when he dies, could live to 100, she's going to get $150,000. Right, correct, Your Honor. How old is Mrs. Humbles? She's 53. So she's got to wait until she turns 65 or 67 to get any healthcare, right? Unless she gains employment, which is correct. Right, no, I mean government healthcare. Correct. That's 12 years of her having to find one way or another healthcare. Correct, Your Honor. Okay. The court, I believe that the court looked at the factors in 504 when they decided what maintenance should be awarded. With Mr. Humbles actually only receiving $6,300, once he pays $2,500 to Mrs. Humble out of his net, he's got $3,800 to live off of. He chose to purchase the house and take over the marital debt. That takes about $2,200. Well, at the time of this hearing, it was $2,200, which leaves him about $1,500 left for his utilities, any extra medical expenses, anything else that he might need. It leaves him about $1,500. During the testimony at trial, when Mrs. Humbles was asked, does she know what amount she's going to need to live off of as of today, her response was no, she didn't know. But then she testified later that she needed about $663 a month, $271 for food, $201 for gas, $50 for clothes, $101 for cell phone, and $0 to $40 for her medical expenses, which did not include rent or utilities. I agree with that, that that was going to be an extra expense, but $663 a month. The court gave her $2,500. Mrs. Humbles was employed as a business coordinator at the Fountains of Shiloh on one of the trial days. She was working 40 hours per week at $13.25 an hour. She has some college education, and so she was making $27,000 an hour, and she voluntarily left that job. Well, case law is clear that you need to make a good effort to gain employment, but she left that job and gave no reason why she left it. There was no medical evidence offered why she left the job, but she had also testified that she would have had health care after 90 days had she stayed there. As far as the attorney's fees, there has been multiple case law that, as a general rule, attorneys fees are primarily responsible of the party to whom the services are rendered. In this case, Mr. Humbles had to pay nearly 50 percent of the fees. It was $12,092, I believe, that was owed, and Mr. Humbles had to pay Mr. Hudnick $6,000. And I believe that once Mr. Humbles, out of the $6,300, gives her $2,500, he has $3,800 left. If you multiply that by 12, it gives Mr. Humbles about $46,000 a year. If Mrs. Humbles had kept the job making $27,000 a year and gotten $30,000, which is what her maintenance is, that's $57,000 a year. Now, I agree she's going to have tax consequences of maybe 20 percent, but that's about $11,000. So Mrs. Humbles, in essence, is making $46,000 a year off of her, if she had the $27,000 a year job and her maintenance, Mr. Humbles making the same. So I believe that the court considered that. I think they considered the tax consequences, and I don't think they have used their discretion in that case. The court is able to award a reasonable amount for another party's cost and attorney's fees. I think they did just that. I think they looked at the $30,000 she was receiving in maintenance. She had the earning capacity. She could get a $27,000 job. She had one. She had one at the time of trial. So she has the ability to get a job making that much. So I don't think it's unreasonable to ask her to pay one-fifth of her maintenance in attorney's fees. I don't think that was unreasonable for the court, and I think they did have Mr. Humbles pay a reasonable amount for her attorney's fees. As far as the property distribution, as I discussed, the court is to divide that in just proportions after considering all the factors. And I think they did do that. I don't think they have used their discretion in that case. Opposing counsel cites N. Reid, marriage of Gomer. I'm not sure if I'm saying that right, G-A-U-M-E-R, where the wife is awarded 84% of the assets but no maintenance. That was a 38-year marriage. And I'm not sure why he cites it, but I think that he's wanting the court to look at this as a case where she didn't get 84% of the assets, but she got that in addition to maintenance. So she did better than the wife did in Gomer. He also cites Henry marriage of McNeely. That was where the appellate court upheld an award of a 60-40 split in favor of the wife. In that case, the wife was only a high school grad, had three weeks of secretarial training. She had arthritis. She hadn't been employed in the entire marriage. It was 32 years. And they basically said that she was not unemployable, that she could get a job. Thank you. Rebuttal? If you'll please the court, what was not clarified in the argument that was presented was the fact that Mrs. Hubbles had never been able to keep a job for very long. I thought in this $27,000 that she actually resigned. Now, it makes it appear, Judge, as if she had a solid job that for some reason she walked away. Now, the facts were and came out of testimony, she had just started that job. She had been there like a minute and a half. And based on the hourly pay at that time, if she did stay for a year, then she would reap that benefit. Was she fired? No, she couldn't physically handle the job. It was described to her to be one way she got to the job was a small office and with her skills, which were limited way beyond her ability. It was an office job. Yes. And so the way the job was advertised and marketed, I'd look one thing, but then when you got there, oh, my goodness, I can't handle this. Well, we find that in the evidence. Yes. She testified to that reason for leaving. There is absolutely nothing in the entire trial transcript, anyway, under any form, theoretical or otherwise, to suggest that Mrs. Humbles was looking for an opportunity to stay at home, paint her nails and eat hot dogs. She had been working part time jobs over the years at Casa and other things. And her husband, it was fine. That was the life they chose. Wasn't she working at Sam's by the final trial? Nine and a quarter. Yeah, the same type of thing. She's searching the Internet, looking for any way. But she said, I have a duty under the law to try and work something. Well, again, you're looking at the same kind of job. You're looking at part time if you can get it with no benefits. And what have you got? Sure. I guess it's better than nothing. But we're talking about someone who's entitled to something more. She wasn't trying to avoid responsibility. She just didn't have the skills to go get anything worthwhile. And what's interesting about that, and in her testimony, when she was questioned closely at cross-examination about these numbers on your financial statement and planning for this and planning for that. And she testified clearly, almost to her embarrassment, I've never had to do this before. The entire length of the marriage, I was always planning for my husband and the children and myself. I have never had to plan for a budget just for myself.  Now, you say children. I thought they were emancipated. Oh, they're here long ago. Well, I wouldn't say long, but they're gone. Yes. But how old are the children? I think, I think one, maybe, maybe they're both in twenties. I don't recall, quite frankly, Your Honor. The, but entire life. And one was kind of still at home. One had gotten married and was away in the area. So, she's saying essentially what I said at the very beginning. And I have no background besides just being a homemaker. I don't think she should be penalized for that. So, I think our position is clear. We ask this Court again to send it back to address these issues. We thank the Court. The Court will take a shot at the thing. We will take the case under advisement. You're excused. The Court will take a shot at this thing. All rise.